UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| DOROTHY GRAVES, | ) | Civil Action No.: 4:06-0034-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| HORRY-GEORGETOWN | ) | |
| TECHNICAL COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

This is an employment discrimination case.  Plaintiff asserts claims for (1) violation of the

Older Worker's Benefit Protection Act of 1990, 29 U.S.C. § 626(f), (2) violation of the Equal Pay

Act, 29 U.S.C. § 206(d) and (3) constructive discharge.  Plaintiff originally brought this action in the

Horry County Court of Common Pleas.  Defendant removed the action to this court on January 3,

2006.  Presently before the Court is Defendant's Motion for Summary Judgment (Document # 15).[1]

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of

---

[1]Also pending before the Court is Defendant's Motion to Strike (Document # 22)
Plaintiff's Affidavit submitted in response to Defendant's Motion for Summary Judgment.
Specifically, Defendant seeks to strike paragraph eight of the Affidavit, in which Plaintiff states,
"Prior to submitting my resignation I went to Judy who refused to see me and called Mr.
Wilson's office for an appointment and informed them of my issues.  After our discussions,
nothing was done."  Defendant asserts that this statement is inconsistent with Plaintiff's
deposition testimony that she never filed a grievance.  Rule 56(e), Fed.R.Civ.P., requires only
that affidavits submitted in support of a party's position "be made on personal knowledge, . . . set
forth such facts as would be admissible in evidence, and . . . show affirmatively that the affiant is
competent to testify to the matters stated therein."  While it is appropriate for the Court to
disregard inconsistent statements of a party, see Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970,
975-76 (4th Cir.1990); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir.1984), striking
Plaintiff's Affidavit is a drastic sanction not appropriate here.  Therefore, Defendant's Motion to
Strike is **DENIED.**

28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  A hearing was held on June 26, 2007.  Because this is a dispositive motion, this report and recommendation is entered for review by the district judge.

## II.    FACTUAL HISTORY

Plaintiff Dorothy Graves (Plaintiff) earned a diploma in secretarial science from Defendant Horry-Georgetown Technical College (HGTC) in 1973.  Plaintiff Dep. at 7-8.  In 1974, Plaintiff began working at HGTC as an accounting clerk.  Id. at 10.  During her employment with HGTC, Plaintiff earned an associate's degree in secretarial science, a bachelor's degree in business administration and a master's degree in business management.  Id. at 8-9.  Plaintiff held several positions during her employment with HGTC, including Accounting Clerk, Purchasing, Accounts Payable, Accounts Payable Manager and Procurement.  Id. at 12-14.  Plaintiff worked other, part-time jobs during the course of her employment with HGTC.  Id. at 49.

In September of 1999, Plaintiff became the Procurement Manager.  Id. at 17.  As Procurement Manager, Plaintiff was responsible for managing all purchases and expenditures at HGTC within the procurement code.  Id. at 16, 17, 35, 42.  Plaintiff learned through her training that the procurement code governed the purchase procedures within the college.  Id. at 51.  When an individual submitted a requisition form to Plaintiff, she reviewed the form to make sure that it contained the proper information and signatures.  Id. at 42.  If the request was properly filed and the budget held the funds for the procurement, Plaintiff would send the information to the Assistant to Procurement, who would sign a purchase order.  Id. at 43.  Plaintiff testified that she never denied a procurement, but would hold the request if funds were not available at the time or return the request for additional information if the forms had not been completed correctly. Id. at 43, 44.

When Plaintiff began her position as Procurement Manager, her supervisor was Fred Bauer. Id. at 16. Plaintiff completed several major projects while she was supervised by Bauer, including procurement for the book store and procurement for the construction and furnishing of a new building. Id. at 34. Plaintiff testified that she never had any problems with Bauer. Id. However, she occasionally had disagreements with other employees at HGTC because they were dissatisfied with the procurement process and how they were required to proceed to make a purchase. Id. at 16-17. The disagreements usually occurred because an employee wanted to order an item but did not like the selections available from the vendors with which HGTC had contracted. Id. at 17. Plaintiff testified that may employees "wanted to order whatever they wanted without going through the procurement process." Id. at 28-29. Other employees complained because they did not like the snacks or beverages offered in the vending machines. Id. at 22, 26. Plaintiff also received several complaints about one of the employees in the shipping and receiving and inventory department. Id. at 21. According to Plaintiff, when she investigated the complaints about the employee, they turned out to be invalid. Id. at 21-22. Plaintiff testified she felt she was being harassed by these various complaints. Id. at 22.

At some point in 2004, Plaintiff applied for a position with the Horry County School District. Id. at 21. Plaintiff testified that she just wanted to see what was available because of the problems in the procurement department. Id. at 21.

Also in 2004, Harold Hawley was hired as the Vice President of Business Affairs at HGTC. Id. at 31. As Vice President of Business Affairs, Hawley supervised Plaintiff. Id. at 32, 52. Plaintiff testified that her working relationship with Hawley was "up and down." Id. at 33. When Plaintiff first met with Hawley, he asked her to step down from her position because he had someone else in

mind for the position.  Id. at 17.  He later told her he wanted to hire a professional buyer who could

get around the procurement code but still be in compliance.  Id. at 69-70.  She testified that "one day

he would come in all excited and tell me, you know, how he was glad that I got the contract out for

him and all of that done, and then the next day he would come in and tell me that he still wanted me

to resign from my position."  Id. at 33.  Plaintiff estimated that Hawley asked her to resign on five

to six occasions during the six months she worked under him.  Id. at 91.  Plaintiff was also told that

both Dr. Marilyn Fore, a professor who complained about the procurement process, and Neyle

Wilson, the President of HGTC, wanted her out of the position.  Id. at 77.  On one occasion, Hawley

told Plaintiff that she should go ahead and resign from her position because, as a black female, she

wasn't going to move up any further.  Id. at 47.  Hawley also began to take away her duties and

responsibilities.  Id. at 26-27.  On another occasion, Hawley told Plaintiff that she could leave or stay

there and go through hell.  Id. at 46.  Plaintiff testified that she told Wilson of these statements before

she left in February of 2005 but not at  the time they occurred.  Id. at 47.

As Procurement Manager, Plaintiff supervised the Assistant to Procurement, Dyan Todd.

Id. at 51.  Todd's duties required her to submit all procurement through Plaintiff as the Procurement

Manager.  Id. at 39-41.  When an audit was conducted of the procurement department, it was

discovered that some procurements were "sent through" without first going through Plaintiff.  Id. at

39.  Plaintiff testified that these "unauthorized" procurements were done by Todd.  Id. at 40.  Todd

would receive approvals for procurements from Ellen Black, the former interim Vice President of

Business and later the Accounting Manager, rather than Plaintiff.  Id. at 48.  Plaintiff told Wilson she

thought Black's behavior was harassing.  Id. at 48.

-4-

Plaintiff testified in her deposition that she never filed any formal grievances with HGTC regarding Hawley's comments or the harassment she was receiving, but she did speak to the supervisors of the employees that were harassing her and she spoke to Wilson about Hawley's comments before she resigned in February of 2005.  Id. at 47, 64.

Plaintiff was supposed to receive a yearly evaluation a few weeks before her anniversary date, which was in March.  Id. at 75, 76.  In early 2005, Hawley told Plaintiff that he had her evaluation in his office but that he and Wilson had not yet decided how they were going to evaluate her.  Id. at 75-76.  According to Plaintiff, Hawley told her that holding on to her evaluation was one way to "deal with" her.  Id. at 76.

In February of 2005, Plaintiff noticed that Todd had requested to take some courses.  Id. at 92.  Plaintiff did not initially approve the courses because she did not believe there was enough money in the budget for them.  Id.  When Plaintiff informed Todd of her decision not to approve the courses, Todd stated that Black and Hawley said she could take the courses.  Id.  Plaintiff then spoke with Black who told her that Hawley said he would put some money in the budget for the classes.  Id.  Plaintiff then approved the procurement classes Todd requested to take but not a personal enrichment course she requested.  Id. at 93.  Later that day, Plaintiff met with Hawley, Todd and Judy Hardee, Associate Vice President of Human Resources.  Hawley told Plaintiff he had received a lot of complaints about her.  Id. at 44.  Hawley stated nobody liked coming to the procurement department and talking to her and that it was a barrier.  Id. at 44.  He also told her that he was sick and tired of her.  Id. at 93.  During the meeting, Hawley gave her 15 minutes to get herself together or he was going to "do something with [her]."  Id. at 44.  Plaintiff decided to resign at that time because she felt she was treated "bad," "harassed" and "discriminated against."  Id. at 44, 95.

-5-

Plaintiff testified, "I didn't know what to do.  And I told [Hawley] I would go ahead and do what he had asked me.  I would go ahead and resign."  Id. at 95.  Plaintiff submitted her letter of resignation on February 23, 2005, effective March 11, 2005.  Ex. 2 to Defendant's Motion; Plaintiff Dep. at 103. On March 7, 2005, Plaintiff filled out a form entitled, "Horry-Georgetown Technical College Termination Questionaire."  Ex. 1 to Defendant's Motion.  In response to the question, "Are you leaving for any reason that would appear to be discriminatory on the basis of race, color, sex, religion, national origin, age, handicap, or Vietnam Era Veteran," Plaintiff checked "yes."  Id.

After Plaintiff received her Bachelor's Degree, while she was in the accounts payable department, she requested a raise, which was within the "salary band" determined by the state for her position. Plaintiff Dep. at 54.  The request was denied by Wilson, who was the Vice President of Finance at the time.  Id. at 55.  Plaintiff again requested a raise after she received her Master's Degree.  Id. at 56.  At that time, Plaintiff held the position of Procurement Manager.  That request was also denied because she was making the same salary as Procurement Managers at other colleges. Id.  According to Plaintiff, some of the other colleges did not hold the same certification to handle bidding as HGTC, and so those in her same position at those colleges did not do the same work she did.  Id. at 58.  While she handled the entire bidding process, those in her same position at other colleges only gathered quotes and then sent the information to the state to handle the bidding.  Id. According to Plaintiff, she did not request a raise that would have been outside her "salary band." Id. at 60.  At the time of her request, she was making $44,854 and the maximum salary for her "salary band" was $48,804.  Id. at 60-61.

While with HGTC, Plaintiff participated in the state's Teacher and Employee Retirement Incentive (TERI) program.  The TERI program allows qualified individuals who have been

employed for 28 years with certain employers, including HGTC, to continue employment, receive

a salary and receive retirement benefits in a special account for five years. Id. at 62. Plaintiff started

the TERI program in July of 2002. Id. at 62. Plaintiff resigned less than five years later, in February

of 2005, and, thus, was not allowed to complete her participation in the TERI program. Id. at 78.

## III.    STANDARDS OF REVIEW

### A.    Summary Judgment Standard

The moving party bears the burden of showing that summary judgment is proper. Summary

judgment is proper if there is no genuine issue of material fact and the moving party is entitled to

judgment as a matter of law. Rule 56(c), FRCP; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Summary judgment is proper if the non-moving party fails to establish an essential element of any

cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317.

Once the moving party has brought into question whether there is a genuine issue for trial on a

material element of the non-moving party's claims, the non-moving party bears the burden of coming

forward with specific facts which show a genuine issue for trial. Fed.R.Civ.P. 56(e); Matsushita

Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party

must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could

reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and

inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving

party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may

not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary

judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on

must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."

Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

Rule 56(e) provides, "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." See also Celetex Corp. v. Catrett, 477 U.S. 317, 324 (1986)(Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves").  To raise a genuine issue of material fact, a party may not rest upon the mere allegations or denials of his pleadings.  Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." Celetex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  See also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

**B.    Rule 12(b)(6) Standard**

A motion to dismiss under Rule 12 tests the sufficiency of the complaint.  A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. It does not resolve conflicts of facts, the merits of the claim, or the applicability of defenses asserted.  Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  In considering a motion to dismiss, the factual allegations in the complaint are accepted as true and the plaintiff is afforded the benefit of all reasonable inferences that can be drawn from those allegations.  Mylan Laboratories, Inc. v. Matkari, 7 F.3d 1130,1134 (4th Cir. 1993).

-8-

IV.     **DISCUSSION**

A.     **Violation of the Older Worker's Benefit Protection Act (OWBPA) of 1990**

Plaintiff alleges that Defendant violated the OWBPA by forcing her to resign, thereby precluding her from collecting her TERI retirement benefits. Plaintiff claims that HGTC "wanted Plaintiff to resign her employment to deprive her of her right to TERI retirement benefits." Plaintiff's Response at 6. She also states, "the Plaintiff's contention that during the exit interview and resignation process, the Defendant failed to fully inform her of her rights under the OWBPA." Id. at 14. Defendant asserts that Plaintiff's OWBPA claim should be dismissed pursuant to Rule 12(b)(6) because the OWBPA is not a viable cause of action independent of an ADEA age discrimination claim and Plaintiff has not asserted an age discrimination claim pursuant to the ADEA.

The Fourth Circuit has not addressed this issue. However, in Whitehead v. Oklahoma Gas & Elec. Co., 187 F.3d 1184 (10th Cir. 1999), the Tenth Circuit held that a plaintiff cannot maintain a separate cause of action based solely on an OWBPA violation. Id. at 1191. The court explained the interplay between the ADEA and the OWBPA:

> In 1990, Congress amended the ADEA by passing the OWBPA, which states, in relevant part: "An individual may not waive any right or claim under [the ADEA] unless the waiver is knowing and voluntary.... [A] waiver may not be considered knowing and voluntary unless at a minimum" it satisfies certain enumerated requirements. 29 U.S.C. § 626(f)(1). Those enumerated requirements, in relevant parts, include giving each employee "a period of at least 45 days within which to consider" an exit incentive or other employment termination program. 29 U.S.C. § 626(f)(1)(F)(ii).
>
> * * *
>
> The Supreme Court has made it clear that the "OWBPA governs the effect under federal law of waivers or releases on ADEA claims ..." Oubre v. Entergy Operations, Inc., 522 U.S. 422, 427, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998) (emphasis added);

-9-

see also, id. at 426-27, 118 S.Ct. 838 ("The statutory command is clear: An employee 'may not waive' an ADEA claim unless the waiver or release satisfies the OWBPA's requirements."); id. at 428, 118 S.Ct. 838 ("The statute governs the effect of the release on ADEA claims...."); Lockheed Corp. v. Spink, 517 U.S. 882, 894 n. 6, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996) ("The Older Workers Benefit Protection Act ... establishes requirements for the enforceability of employee waivers of ADEA claims made in exchange for early retirement benefits."). This language strongly indicates that the OWBPA simply determines whether an employee has, as a matter of law, waived the right to bring a separate and distinct ADEA claim. The OWBPA does not, by itself, determine in the first instance whether age discrimination has occurred. Indeed, Appellants have not cited a single case in which a court has held otherwise. Moreover, the legislative history of the OWBPA clearly distinguishes between bringing an age discrimination suit and a claim that the OWBPA has been violated. The Senate Report accompanying the enactment of the OWBPA stated that waiver provisions of the OWBPA protect the rights and benefits of older workers by "ensur[ing] that older workers are not coerced or manipulated into waiving their rights to seek legal relief under the ADEA." S.Rep. No. 101-263, at 5 (1990), reprinted in 1990 U.S.C.C.A.N. 1509, 1510.

Id. at 1191-92; see also Krane v. Capital One Services, 314 F.Supp.2d 589, 609 (E.D.Va. 2004) (holding that a violation of section 626(f) of the OWBPA, without an accompanying age discrimination claim, is not viable); Equal Employment Opportunity Commission v. Sears, Roebuck and Company, 883 F.Supp. 211, 215 (N.D.Ill.1995) (holding that, "to the extent the EEOC is attempting to create a cause of action based solely on an OWBPA violation, 29 U.S.C. § 626(f), the Court concludes that such a claim must be dismissed as a matter of law"); Williams v. General Motors Corporation, 901 F.Supp. 252, 254 (E.D.Mich.1995) (construing section 626(f) as not affording "a substantive cause of action under ADEA").

The OWBPA was enacted to invalidate a waiver of a ADEA claim that does not comply with §626(f).  The OWBPA does not provide a cause of action for an improper waiver of employee

benefits irrespective of a violation of the ADEA. Plaintiff fails to allege a violation of the ADEA[2],

thus her claim under the OWBPA fails as a matter of law. Furthermore, even if Plaintiff had alleged

a violation of the ADEA, dismissal would still be appropriate because Plaintiff failed to exhaust the

administrative remedies required for such a claim. See Smith v. First Union Nat'l Bank, 202 E.3d

234, 247 (4th Cir.2000).

### B.     Violation of the Equal Pay Act (EPA)

Plaintiff alleges that Defendant violated the EPA because she was denied several requests

for raises. The EPA provides that

> (1) No employer having employees subject to any provisions of this section shall
> discriminate, within any establishment in which such employees are employed,
> between employees on the basis of sex by paying wages to employees in such
> establishment at a rate less than the rate at which he pays wages to employees of the
> opposite sex in such establishment for equal work on jobs the performance of which
> requires equal skill, effort, and responsibility, and which are performed under similar
> working conditions, except where such payment is made pursuant to (i) a seniority
> system; (ii) a merit system; (iii) a system which measures earnings by quantity or
> quality of production; or (iv) a differential based on any other factor other than sex....

29 U.S.C. § 206(d)(1).

To establish a prima facie case under the EPA, a plaintiff must show that she received less

pay than a male co-employee performing work substantially equal in skill, effort, and responsibility

under similar working conditions. Houck v. Virginia Polytechnic Inst. & State Univ., 10 F.3d 204,

206 (4th Cir.1993). If a plaintiff establishes a prima facie case, the burden shifts to the defendant to

prove that the difference in salary is justified by one or more of the four statutory exceptions. 29

---

[2]Plaintiff argues that the court ought to infer an age discrimination claim from the fact
that she raises the OWBPA claim. However, as set forth in Whitehead, a violation of the
OWBPA, by itself, does not establish age discrmination. Whitehead, 187 F.3d at 1192.

U.S.C. § 206(d)(1) (2002); Equal Employment Opportunity Comm'n v. Aetna Co., 616 F.2d 719, 724 (4th Cir.1980)(quoting § 206(d)(1)). If the defendant successfully meet this burden, then the plaintiff's claim fails "unless the plaintiff can satisfactorily rebut the defendants' evidence." Strag v. Board of Trustees, 55 F.3d 943, 948 (4th Cir.1995).

Plaintiff offers as a "comparator" Mr. Thompson, Assistant to the President, Director of College Relations and Marketing. Plaintiff Dep. at 87-88. When asked to explain how her position was similar to that of Mr. Thompson's, Plaintiff responded, "Well, I'm not saying that they're similar. I'm saying that he was allowed the opportunity to get increases in his salary." Id. at 88. Plaintiff also admitted that she did not know his job description or even how much money he made. Id. at 89. The only information Plaintiff knows about Mr. Thompson is what she saw in a newspaper article. Id. The article provided various salary ranges and listed the employees at the college that fell within each range. Id. Plaintiff argues in her Response only that, "considering that the band was beyond the plaintiff the pay was discriminatory." In light of the fact that Plaintiff has failed to present any evidence whatsoever that "she received less pay than a male co-employee performing work substantially equal in skill, effort, and responsibility under similar working conditions," her EPA claim fails as a matter of law.

### C.     Constructive Discharge

In its Motion for Summary Judgment, Defendant argues that Plaintiff fails to establish a prima facie case of constructive discharge under Title VII. At the hearing on June 26, 2007, the undersigned sought clarification as to whether Plaintiff's constructive discharge claim was brought pursuant to Title VII or under state law. Plaintiff's counsel stated that the constructive discharge

-12-

claim was brought only under state law, which is consistent with the allegations set forth in the Complaint. Defendant has not moved for summary judgment as to Plaintiff's state law claim for constructive discharge.

If the Court accepts this report and recommendation, then the original federal jurisdiction claims will be dismissed. Title 28 U.S.C. § 1367(c)(3) provides, in pertinent part, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ." The Fourth Circuit has recognized that "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir.1995) (holding district court did not abuse its discretion in declining to retain jurisdiction over the state law claims). See also, e.g., United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726-27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Revene v. Charles County Comm'rs, 882 F.2d 870, 875 (4th Cir.1989). Therefore, the undersigned recommends that the Court decline to retain jurisdiction over Plaintiff's state law cause of action for constructive discharge and remand the case back to the Horry County Court of Common Pleas.

V.     CONCLUSION

In light of the above analysis, it is recommended that Defendant's Motion for Summary Judgment (Document # 15) be granted as to Plaintiff's OWBPA and EPA claims and that the Court decline to retain jurisdiction over Plaintiff's state law cause of action for constructive discharge and remand the case back to the Horry County Court of Common Pleas.

-13-

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

July 6, 2007
Florence, South Carolina

**The parties' attention is directed to the important notice contained of the following page.**